*Decision will be entered under Rule 50.*

ESTATE OF JAMES H. LUMPKIN, JR., DECEASED, CHRISTINE T. HAMILTON, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1715-68. Filed July 19, 1971.

---

*Rudy M. Groom*, for the petitioner.
*Daniel A. Taylor, Jr.*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $8,070.42. The sole issue presented for decision is whether at the time of his death, decedent possessed any of the incidents of ownership in a group term life insurance policy within the meaning of section 2042.[1]

FINDINGS OF FACT

Christine T. Hamilton (hereinafter referred to as petitioner) is the surviving spouse and independent executrix of the Estate of James H. Lumpkin, Jr. (hereinafter decedent), who died on March 15, 1964. She was a resident of Houston, Tex., at the time she filed her petition. She filed the Federal estate tax return with the district director of internal revenue, Austin, Tex.

Decedent was an employee of Humble Oil & Refining Co. (hereinafter Humble) at the time of his death, and was covered by Group Term Life Insurance Policy No. 13550 issued to Humble by the Equitable Life Assurance Society of the United States (hereinafter Society). Humble paid all the premiums on the policy.

During 1960, Standard Oil Co. of New Jersey (hereinafter Standard), in behalf of Humble, submitted to several insurance companies specifications for insurance to be provided for Humble's employees and requested bids thereon. On December 23, 1960, Standard selected one of the companies, the Society, as the administrator of the insurance plan. The specifications of the benefits to be provided, together with the terms of a similar insurance policy which was in effect prior to January 1, 1961, formed the basis for policy No. 13550 which was delivered on May 11, 1964, but took effect on January 1, 1961.

Prior to May 11, 1964, there was no single document which stated precisely the terms of the policy. During the period between January 1, 1961, when the insurance coverage became effective, and May 11, 1964, when the policy was delivered to Humble, the wording of the policy was drafted, and approval of its terms was obtained from the insurance commissions of the States of Delaware and New York. The substantive provisions of the policy, however, were not changed during this period.

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

In January 1962, Humble issued a booklet to its employees describing the benefits provided under the policy as follows:

### NONCONTRIBUTORY GROUP LIFE INSURANCE

This insurance coverage is available to employees at no cost to themselves and is designed to provide payments to dependent relatives for a period of time. The proceeds of this insurance will be paid to the employee's survivors in the first class of preference relatives described below in which there is a survivor:

Classes of Preference Relatives
1. Spouse
2. Minor or permanently disabled children
3. Parents

who qualify

To qualify, these relatives must have been either (1) living with the employee at the time of his death or (2) dependent* upon him. They must be able to furnish satisfactory proof of their relationship and dependency.

Payments to preference relatives consist of:
1. A lump sum of $500 payable at time of death, plus
2. A series of monthly payments, each amounting to ½ of the employee's monthly normal compensation at the time of death. These installments continue for a period of time, depending upon the employee's Benefit Plan service as shown on this table. If more than one beneficiary survives in the same class, the installments are divided equally among them.

| No. of years of service | No. of monthly installments |
|---|---|
| 1 | 6 |
| 2 | 10 |
| 3 | 14 |
| 4 | 18 |
| 5 | 24 |
| 10 | 29 |
| 20 | 39 |
| 30 | 49 |

Increasing by one payment for each year of service.

If a preference relative dies before the series of installments is complete, then any remaining payments will be made to other preference relatives in the same class; or if there is none, in the next lower class in which there is a preference relative. If there are no remaining preference relatives then payments stop.

*Receiving support from the employee to the extent of at least 20% of the employee's income.

The payments were to be made to the beneficiaries as follows:

The $500 lump sum benefit is payable at death, with installments payable monthly * * *; however, you may elect to spread payments out over a still longer period by reducing the amount payable each month. If you have not made such an election, a beneficiary may do so upon your death. Lump sum payment of the full amount is not possible.

The booklet also states that, under the noncontributory group life insurance plan, "Protection ceases on termination of employment."

In describing another life insurance plan for which the employees paid part of the premiums, the booklet states that it provided for a "conversion privilege"; no similar statement was made in describing the policy here involved.

The policy as issued recites that "This policy is delivered on the eleventh day of May 1964, in the State of Delaware and is governed by the laws thereof." The policy provides for "Fixed Group Life Insurance Coverage" and "Contingent Survivors Group Life Insurance Coverage." The "Fixed Group Life Insurance Coverage" provides for an amount of $300 to be paid immediately on the employee's death either to his preference relatives, dependent other relatives, or the person who paid the expenses of his last illness or burial.

The policy contains the following additional provisions:

J. "Preference relative" means a person who, at the time of the death of the covered individual, is a member of one of the following classes of relatives of the covered individual:

1. Qualifying spouse.
2. Qualifying children who are under 21 years of age or permanently incapable of self-support.
3. Qualifying parents.

"Qualifying" means, in this definition, living with the covered individual or receiving support from him to the extent of at least 20% of the amount the covered individual was last receiving (when receiving something) as an employee or annuitant.

"Spouse" means person lawfully married to the covered individual.

"Child" means legitimate (including posthumous) son or daughter, stepson or stepdaughter, or legally adopted son or daughter. But there is this exception: if a child of the covered individual is legally adopted by another person of the same sex as the covered individual, then he is not a child of the covered individual.

"Parent" means the person whose legitimate child, stepchild, or legally adopted child the covered individual is.

K. "Dependent other relative" means a relative by blood or marriage (other than a preference relative) toward whose support the covered individual had expended at least $300 during the year preceding his death, and was still expending something at the time of his death.

\* \* \* \* \* \* \*

Part 2—Contingent Survivors Group Life Insurance Coverage

If due proof in writing is received by the Society that the death of an individual occurred while he was insured under this policy and that he is survived by a beneficiary, the following survivor payments will be made:

A. If the individual is a covered employee, the survivor payments shall consist of:

1. a lump sum payment of $200, and
2. a series of monthly installments, the amount and number of which shall be determined as follows:
   (a) Amount:
   If any preference relative survives the employee, the amount of each monthly installment shall be ½ of the employee's monthly normal compensation as of the governing date.

If no preference relative survives the employee, but one or more dependent other relatives survive him, the amount of each monthly installment shall be the lesser of the following amounts:

    (i) ½ of the employee's monthly normal compensation as of the governing date, and

    (ii) The average monthly rate of the employee's expenditures as of the governing date for the support of the dependent other relatives who are still living when the installment becomes due.

(b) Number:

The maximum number of monthly installments shall depend on the individual's complete years of Benefit Plan Service as of the governing date as follows:

| Complete years | Maximum number of monthly installments |
|---|---|
| 1 but less than 2 | 6 |
| 2 but less than 3 | 10 |
| 3 but less than 4 | 14 |
| 4 but less than 5 | 18 |
| 5 | 24 |

Plus one additional monthly installment for each complete year of Benefit Plan Service in excess of five.

\*      \*      \*      \*      \*      \*      \*

D. Beneficiary entitled to payments:

1. If the covered individual is survived by a preference relative, the lump sum payment and the monthly installments provided under this Part 2 shall be payable to the member or members (in equal shares) in the first class of preference relatives of which a member or members shall survive such individual. If the insured is not survived by a preference relative and one or more dependent other relatives are living, the lump sum payment and the monthly installments under this Part 2 shall be payable to such relatives then surviving in the proportion which the individual's average expenditure for the support of each such relative bore to the total of his average expenditure for the support of all such relatives at the time of his death.

For purposes of the above paragraph:

    (a) Each payment referred to therein shall be payable, when it becomes due, to the member or members in the first class of preference relatives surviving on such due date, and

    (b) "Average expenditure" means average monthly expenditure, determined at the time of the covered individual's death, during a period of not more than one year ending with his death.

2. In the event a spouse, having qualified for monthly installments, dies prior to the expiration of the period over which the maximum number of monthly installments are provided with respect to the covered individual, the right to any monthly installments for the remainder of such period shall thereupon pass to any surviving children under class 2 of preference relative or, if there are none, then to any surviving parents under class 3 of preference relative.

3. In the event a child, having qualified for monthly installments, dies prior to the expiration of the period over which the maximum number of monthly installments are provided with respect to the covered individual, the amount of the remaining monthly installments shall thereupon be divided equally among any surviving children under class 2 of

preference relative. In the event the last such surviving child dies prior to the expiration of the period over which the maximum number of monthly installments are provided with respect to the covered individual, the right to any monthly installments for the remainder of such period shall thereupon pass to any surviving parent under class 3 of preference relative.

4. In the event more than one parent qualifies for monthly installments and either parent dies prior to the expiration of the period over which the maximum number of monthly installments are provided with respect to the insured individual, the amount of the remaining monthly installments shall thereupon be payable to the surviving parent under class 3 of preference relative.

5. In the event of the death of the last surviving preference relatives prior to the expiration of the period over which the maximum number of monthly installments are provided with respect to the covered individual, no further monthly installment payments shall be payable with respect to the death of the covered individual.

E. Credit for other benefits:

The foregoing provisions with respect to monthly installments shall be subject to the limitation hereinafter provided. Any payments under this Part 2 shall be reduced, as determined by his employer, by the amount of any benefit under any plan, program, arrangement or agreement of the Employer or any affiliate which, as determined by his employer, is payable for the same reason and with respect to the same person as the payments described in this Part 2.

In the event there shall cease to be any preference relative or dependent other relative, the Society shall have no further liability on account of the death of the covered individual, except to the extent of any amount then held under a fund pursuant to the "Optional Modes of Settlement" provision.

### Optional Modes of Settlement

A covered individual may elect that only a portion of each monthly installment becoming payable to his spouse in accordance with the foregoing provisions of this Part 2 be paid on its due date. Such portion shall be equal to 25% of the covered individual's monthly normal compensation reduced in the case of a covered annuitant by the total amount of benefits available (other than a lump sum payment) to his spouse and any children in her care under the U.S. Social Security Act as it reads at the time the covered annuitant dies, provided, however, that the portion so payable shall not be less than 10% of the covered annuitant's monthly normal compensation. This election shall be made by the covered individual during his lifetime by proper written request submitted to the Society on a form furnished by or acceptable to the Society.

\*         \*         \*         \*         \*         \*         \*

In the event the election pursuant to the foregoing shall have been made, the balance of each monthly installment payable to the spouse shall be held by the Society and accumulated as a fund, with interest credited at the effective rate authorized from time to time by the Board of Directors of the Society but at an effective rate of not less than 2½% per annum, subject to the further provisions hereof. Such interest shall be credited at the end of each month on the average balance remaining in the fund after the first day of such interest period. In the event the spouse receives the maximum number of monthly installments provided with respect to the covered individual by the foregoing provisions of this Part 2, the fund shall, except as hereinafter provided, be applied to continue monthly

installments to the spouse, each in an amount determined on the same basis as the portion of the monthly installment paid to the spouse on its due date under the election, until the fund is exhausted, the first additional monthly installment becoming payable one month after the last monthly installment becomes due. In the event the spouse dies at any time while there is an amount in such fund, such amount shall be payable without further accrual of interest in one sum to the executors or administrators of such spouse's estate.

An election other than that specified above may be arranged during the lifetime of a covered individual with respect to monthly installments becoming payable to the covered individual's preference relatives if the covered individual, the employer by whom employed and the Society mutually agree thereon.

        *         *         *         *         *         *         *

Benefits payable under this policy with respect to any covered individual shall be payable only to the person or persons entitled thereto pursuant to the provisions of Part 1 and Part 2 of the section entitled "Group Life Insurance Benefits." A covered individual shall have no right to designate a person or persons to receive any benefits payable under this policy either by request, assignment or by any other means, but may assign or transfer all rights he may possess under this policy. Once such an assignment or transfer has been made the assignee or transferee shall have the sole right to exercise all of the rights under this policy granted the covered individual.

Benefits payable under this policy with respect to any covered individual shall not be assigned by any of his beneficiaries, and, to the extent permitted by law, shall not be subject to garnishment, attachment, execution or levy of any kind.

By reason of decedent's death, the Society became obligated under the terms of the policy to make payments having a value of $53,480.81. Respondent determined "that the value of a group life insurance policy with the Equitable Life Assurance Society of the United States * * * is includable in the decedent's gross estate in accordance with section 2042 of the Internal Revenue Code because the decedent possessed incidents of ownership in the policy."

### OPINION

The only issue presented for decision is whether the value of the proceeds of a group life insurance policy which became payable on the decedent's death is includable in his gross estate under section 2042(2).[2] The decision turns on whether the decedent "possessed at his death any of the incidents of ownership" with respect to the policy.

Prior to the adoption of the Revenue Act of 1942, the inclusion of the proceeds of life insurance in a decedent's gross estate was limited to "policies taken out" by the decedent on his own life. Sec. 811(g),

---

[2] SEC. 2042. PROCEEDS OF LIFE INSURANCE.

The value of the gross estate shall include the value of all property—

   *       *       *       *       *       *       *

(2) RECEIVABLE BY OTHER BENEFICIARIES.—To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. * * *

I.R.C. 1939. The statutory language providing for this inclusion often presented difficult problems of interpretation, and through judicial decisions two tests evolved: "payment of premiums" and possession of "incidents of ownership." Section 404 of the Revenue Act of 1942, ch. 619, 56 Stat. 798, eliminated the "policies taken out" language and adopted the judicial criteria. The accompanying committee reports give an illustrative list of "incidents of ownership," including "the right of the insured or his estate to the economic benefits of the insurance, the power to change the beneficiary, the power to surrender or cancel the policy, the power to assign it, the power to revoke an assignment, the power to pledge the policy for a loan, or the power to obtain from the insurer a loan against the surrender value of the policy." H. Rept. No. 2333, 77th Cong., 1st Sess. (1942), 1942–2 C.B. 491; S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 677; see also *Chase Nat. Bank* v. *United States*, 278 U.S. 327, 335 (1929); cf. Estate Tax Regs., sec. 20.2042–1(c)(2).[3] When the 1954 Code was adopted, section 2042 eliminated the "payment of premiums" provision, leaving the "incidents of ownership" test as the sole criterion for determining whether the proceeds of life insurance are to be included in a decedent's gross estate. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 124, 472–473 (1954). In adopting this latter test, "What * * * [Congress] was attempting to reach * * * was the *power* to dispose of property." *United States* v. *Rhode Island Hospital Trust Co.*, 355 F.2d 7, 10 (C.A. 1, 1966).

In the instant case, the benefits provided under the group policy maintained by Humble for its employees are carefully circumscribed, and the decedent had hardly any power to dispose of them. Such benefits are payable only if the insured is an employee at his death. The proceeds consist of lump sums totaling $500 plus installments payable to three classes of preference relatives, (1) spouse, (2) minor or permanently disabled children, and (3) parents, and, if there are no preference relatives, to dependent other relatives. To qualify for benefits, preference relatives must have been either (a) living with the employee at the time of his death, or (b) dependent (i.e., receiving support from the employee to the extent of at least 20 percent of the employee's income). If the employee leaves no preference or dependent other relatives, nothing is payable on his death except the Fixed Group

---

[3] Sec. 20.2042–1 *Proceeds of life insurance.*

(c) *Receivable by other beneficiaries.* * * *

(2) For purposes of this paragraph, the term "incidents of ownership" is not limited in its meaning to ownership of the policy in the technical legal sense. Generally speaking, the term has reference to the right of the insured or his estate to the economic benefits of the policy. Thus, it includes the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy, etc. Similarly, the term includes a power to change the beneficiary reserved to a corporation of which the decedent is sole stockholder.

Life Insurance Coverage benefits ($300) which may be distributed to the person who pays the expenses of the employee's last illness or burial. The number of installments is measured by the employee's number of years of service with the company. If a preference relative of one class dies before all the installments are paid, the payments are then made to other relatives in that class; if there are no other such relatives, the payments are made to relatives in the next lower class. If there are no remaining preference relatives, the payments cease.

The incidents of ownership listed in section 20.2042–1(c) of the regulations, quoted in footnote 3 *supra*, are those typically found in individual insurance policies. The decedent possessed none of them in their normal form. Respondent contends, however, that the decedent possessed the following incidents of ownership with respect to the Humble group policy, and argues that any one of them requires the inclusion of the value of the policy benefits in the gross estate: (1) He could select an optional mode of settlement; (2) he could, by quitting his job, cancel his insurance coverage; (3) by reason of the laws of Texas and New York, he could convert his insurance coverage from a group policy to an individual one on the termination of his employment; and (4) he could assign his rights under the policy.

1. *Optional mode of settlement.*—The selection of optional modes of settlement of a life insurance policy is ordinarily associated with the ownership of the policy or, following maturity, with the rights of the beneficiary. However, we do not think the decedent's limited rights to make such a selection under the group policy here in question were sufficient to constitute an incident of ownership within the meaning of section 2042(2).

An employee's options under this group policy are extremely limited ones. They apply only to the benefits payable to the spouse; to alter the mode of settlement for any other beneficiary requires the agreement of the covered individual, the employer, and the insurance company. The optional mode of settlement provided for by the policy allows the employee to reduce the amounts of the monthly payments to his spouse from 50 percent of his normal monthly compensation to an amount which, when combined with the social security benefits payable to his spouse and her children, would equal 25 percent of his normal monthly compensation. However, the amount payable each month may not be less than 10 percent of such monthly compensation. Any amount which would be paid to a spouse but for the selection of the optional mode of settlement is to be held by the insurance company as a fund for her and later disbursed to her, together with interest, as additional installments. If the spouse should die before receiving the deferred installments, the fund is immediately payable to the executors or administrators of her estate.

We do not think such a limited option as to mode of settlement is an

incident of ownership within the meaning of section 2042. Its exercise could not benefit the decedent or his estate. See sec. 20.2042–1(c)(2), *supra*. It could affect only the monthly payments which accrue prior to the spouse's death, and one one-half of each of them (plus the adjustment for social security benefits). The other one-half (minus the social security benefits adjustment) is not subject to the option. Moreover, its exercise could not affect the monthly payments which do not accrue prior to the spouse's death; such payments are to be made to the next qualified preference relative, if any. Even that portion of the monthly payments affected by the optional settlement could not be made payable to or for the benefit of someone else. Those funds would be payable to the executor or administrator of the spouse's estate, and are thereby subject to disposition by the spouse's will. This very limited power is not a power to dispose of property and is not an appropriate subject of the estate tax.

Indeed, in *May Billings et al., Executors*, 35 B.T.A. 1147 (1937), acq. 1937–2 C.B. 3, the decedent had much wider options as to the modes of settlement of certain policies than those here involved, and the Board of Tax Appeals held (p. 1152): "The mere right to say when the proceeds of the insurance policies should be paid to the beneficiary does not amount to a control of the proceeds."

Respondent argues that decedent's power to select the mode of settlement could have been used, in the instant case for example, to deny decedent's son the right to participate in the policy benefits in the event of his mother's death. The argument is that the provision of reduced payments to the widow would have entitled her or her estate to all the policy benefits, thus eliminating all of the son's possible rights. We do not so construe the language quoted in our Findings. Only the portion of the monthly payments withheld from her, accumulated in the fund established for her benefit, and remaining unpaid at her death would pass to the executor or administrator of her estate. Upon her death, the remaining unpaid and unaccrued installments would be paid to a preference relative in the next lower class, in the instant case to the son. Thus, the son's benefits would not have been affected by the decedent's exercise of the settlement option.[4]

---

[4] *Commissioner* v. *Estate of Holmes*, 326 U.S. 480 (1946), and *Lober* v. *United States*, 346 U.S. 335 (1953), held that property transferred in trust is includable in a decedent's estate under sec. 2038 where the decedent's exercise of a retained power to terminate a trust would affect only the timing of the beneficiaries' enjoyment of the property. Sec. 2038 refers to incomplete inter vivos transfers. Respondent does not rely upon the principles of sec. 2038 for applying sec. 2042 in the present case. Moreover, his acquiescence (1937–2 C.B. 3) in *May Billings et al., Executors*, 35 B.T.A. 1147 (1937), remains outstanding even though it was decided several years before *Holmes* and *Lober* were decided. Any change of the settlement mode by mutual agreement of Humble, the Society, and the decedent could not have been more extensive than the ones referred to in that acquiescence. Cf. *Kramer* v. *United States*, 406 F.2d 1363, 1369 (Ct.Cl. 1969); *Landorf* v. *United States*, 408 F.2d 461, 470 (Ct.Cl. 1969).

2. *Cancellation of the policy.*—Respondent is undoubtedly correct that decedent had the power to cause the policy to be canceled as to him by quitting his job with Humble. Indeed, the policy expressly provides that the insurance of "any covered employee" shall "cease automatically" upon the termination of the employee's employment. But we do not think this is the kind of right or power which is to be regarded as an incident of ownership within the meaning of 2042(2). The argument here advanced by respondent was rejected in *Landorf* v. *United States*, 408 F.2d 461, 469 (Ct.Cl. 1969), which also involved an issue as to the incidents of ownership of a group policy, as follows:

We do not believe that Congress intended to include the power to terminate employment, a right which everyone can exercise at any time, to be an "incident of ownership" in property simply because the property involved is somehow related to the employment. * * * Accordingly, we find that decedent's right to terminate his employment is not an incident of ownership within the meaning of section 2042.

The right of an employee to effect a cancellation of group insurance coverage as to him by quitting his job is analogous to the right of any insured under an individual policy to cancel it by allowing a policy to lapse for the failure to pay premiums. Long ago it was decided that such a right "certainly" is not the kind of incident of ownership that requires inclusion of the insurance proceeds in the insured's gross estate. *Cowles* v. *United States*, 152 F.2d 212, 214 (C.A. 2, 1945).

Indeed, Estate Tax Regs. section 20.2042–1(c)(2), defining incidents of ownership, explains that, generally speaking, the term "has reference to the right of the insured or his estate to the economic benefits of the policy." Following this explanation is a list of examples, including the power "to surrender or cancel the policy." In our view, this power does not include one which merely permits the insured to destroy the value of the policy by causing it to be terminated—a power from the exercise of which no one, other than possibly the insurance company, derives any economic benefit. Decedent's power to terminate his job was merely a power to determine that no one would receive any benefits from the insurance on his life. He might have achieved a similar result by so arranging family affairs, intentionally or otherwise, that no preference or dependent other relative would be entitled to any benefits under the policy. Clearly the ability to eliminate all benefits which might flow from a policy is not a "power to dispose of property." *United States* v. *Rhode Island Hospital Trust Co.*, *supra* at 10.

We hold that the power to terminate insurance coverage by quitting one's job is not an incident of ownership within the meaning of section 2042. See *Kramer* v. *United States*, 406 F.2d 1363, 1369 (Ct.Cl. 1969); *Estate of Max J. Gorby*, 53 T.C. 80, 88 fn. 11 (1969), acq. 1970–1 C.B. xvi.[5]

---

[5] But see Rev. Rul. 69–54, 1969–1 C.B. 221.

3. *Conversion privilege.*—Respondent next maintains that decedent had a right upon termination of his employment to convert his coverage under the group policy to insurance under an individual policy. Through an exercise of this privilege, the argument goes, decedent possessed power to control the disposition of the insurance proceeds. On this ground, respondent insists decedent possessed an incident of ownership.[6]

The policy covering the decedent does not by its terms provide for a conversion privilege. Respondent's argument is based upon the laws of New York, where Humble and the Society have their principal offices, and Texas, where decedent resided at his death. Those laws state generally that a group policy shall contain a provision that an employee on terminating his coverage under the group policy may take out an individual policy on a permanent plan at the rate based on his attained age without a medical examination. However, the present policy recites that it was delivered in "the State of Delaware and is governed by the laws thereof," and respondent concedes that the laws of Delaware do not require such a conversion privilege. We think Delaware laws control the interpretation of the contract.

In *Boseman* v. *Insurance Co.*, 301 U.S. 196 (1937), an employee of Gulf Oil Corporation sued to recover disability benefits under a group insurance policy issued to that corporation by Connecticut General Life Insurance Co. The insurance company defended on the ground that notice of the injury on which the claim was based was not given within 60 days after the employee terminated his employment. The employee relied upon a Texas statute forbidding policy provisions prescribing periods of less than 90 days for such notices. The policy declared that the law of Pennsylvania should control its interpretation, and the Supreme Court rejected the employee's contention that the law of Texas nevertheless controlled, stating (p. 202):

The oil corporation and respondent intended, and the policy definitely declares, that Pennsylvania law should govern. Undoubtedly, as between employer and insurer, Pennsylvania law controls.[1] "In every forum a contract is governed by the law with a view to which it was made."[2] But the precise issue for decision is whether, as between petitioner and insurer, the policy provision requiring notice of claim is governed by Pennsylvania law or Texas law. Petitioner and other insured employees were not parties to, nor did they have any voice in, the negotiation or consummation of the contract. The terms of the policy were settled by the oil corporation and respondent. * * * The policy did not of itself insure petitioner or any other person. It merely made available specified in-

---

[6] In *Estate of Max J. Gorby,* 53 T.C. 80 (1969), acq. 1970–1 C.B. xvi, we pretermitted the question whether the right to convert (i.e., the right to purchase a new individual life insurance policy upon termination of an employee's coverage under a group policy) is an "incident of ownership" within the meaning of sec. 2042(2). Our disposition of respondent's contention also renders unnecessary a decision of that question in this case.

surance to certain employees. For the payment of premiums the insurer looked only to the corporation. * * *
(Footnotes omitted.)

After rejecting arguments that a certificate of insurance delivered in Texas was the insurance contract and that, consequently, the statutes of that State regulating insurance should control, the Court added (at p. 206) :

> The conclusion that Pennsylvania law governs the policy provision requiring notice of claim is supported not only by the making and delivery of the contract of insurance in that State, the declaration in the policy that Pennsylvania law shall govern and petitioner's acceptance of the insurance according to the terms of the policy but also by the purpose of the parties to the contract that everywhere it shall have the same meaning and give the same protection and that inequalities and confusion liable to result from applications of diverse state laws shall be avoided.[13] [Footnote omitted.]

We think the same reasoning is applicable here. See also *Metropolitan Life Ins. Co.* v. *Wann*, 130 Tex. 400, 109 S.W.2d 470 (1937) ; *Kahn* v. *Great-West Life Assurance Co.*, 61 Misc. 918, 307 N.Y. S. 2d 238 (1970). The benefits under the present policy were designed primarily to provide for a temporary easing of the financial problems of dependent relatives, attributable to the death of an employee. Cf. *Estate of John C. Morrow*, 19 T.C. 1068 (1953). The amount payable as benefits is controlled substantially by the deceased employee's family situation and his Humble tenure and salary, but Humble could reduce the payments under the policy "by the amount of any benefit under any plan, program, arrangement or agreement" which provided payments to the same person. The premiums payable by Humble were evidently negotiated on the assumption that Delaware law would control the interpretation of the policy. A requirement that the Society be willing to convert an employee's coverage on the termination of his employment to a permanent type of insurance would obviously affect its risks and the amounts of the premium payments. Since the policy covered not only the employees of Humble itself but those of 25 affiliates as well, uniform treatment of the employees would require the application of a single State's laws. We think it only reasonable to give effect to the policy provision that Delaware law should control.

We note that even if Texas law is to be applied, the Texas statute (Tex. Ins. Code Ann., art. 3.50, sec. 4 (1963))[7] on which respondent

---

[7] Tex. Ins. Code Ann., art. 3.50, sec. 4 (1963), is as follows :
Sec. 4. GROUP POLICIES UNLAWFUL EXCEPT AS AUTHORIZED.—Except as may be provided in this article, it shall be unlawful to make a contract of life insurance covering a group in this State, and the license to do business in Texas of any company making a contract of life insurance covering a group in this State except as may be provided in this article may be forfeited by a suit brought for that purpose by the Attorney General of the State of Texas at the request of the Board of Insurance Commissioners.

relies, does not purport to rewrite a policy agreement between foreign corporations in such a way as to modify its terms. The statute merely authorizes the State Insurance Commission to take away the insurer's right to do business in Texas. *State* v. *State Mutual Life Assurance Co. of America*, 163 Tex. 240, 353 S.W.2d 412 (1962). The New York statute (N.Y. Ins. Law sec. 161 (McKinney Supp. 1966)) is cast in language similar to the Texas law.

4. *Assignment.*—Our Findings quote a paragraph of the policy which provides that a covered individual has no right to designate any person or persons to receive any benefit payable under the policy by "assignment or by any other means," but "may assign or transfer all rights he may possess" under the policy. As noted above, section 20.2042–1(c) of the regulations, in illustrating the incidents of ownership of a policy, lists "the power to assign" it and the power "to revoke an assignment." Respondent's final argument is that the policy is includable in decedent's gross estate on this ground alone. We do not agree.

We are frequently reminded that taxation is concerned with economic realities and with substance rather than form. We are also taught that the objective of the incidents of ownership test is to tax the power to dispose of property. We think it obvious, therefore, that decedent's power to assign his rights under the policy may constitute a substantive incident of ownership only if one or more of the rights which he may assign constitutes an incident of ownership.

As discussed above, the only substantive power which he possessed was the limited one permitting him to alter the mode of settlement. For the reasons stated, we do not think that power sufficient to bring the policy into the decedent's taxable estate. Therefore, the policy provision authorizing the assignment of such power would not have that effect.

Reviewed by the Court.

*Decision will be entered under Rule 50.*