ESTATE OF MILDRED EATON CHAPMAN, DECEASED, LINDA K. GORDON, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Chapman v. Commissioner
Docket No. 2127-87.
United States Tax Court
T.C. Memo 1989-105; 1989 Tax Ct. Memo LEXIS 105; 56 T.C.M. (CCH) 1451; T.C.M. (RIA) 89105; March 15, 1989
A. Jerry Busby, for the petitioner. Patricia Beary, for the respondent. PARKER
MEMORANDUM FINDINGS OF *107 FACT AND OPINION PARKER, Judge: Respondent determined a deficiency of $ 394,144 in the Federal estate tax of the Estate of Mildred Eaton Chapman, who died in 1982. The sole issue remaining [1] for decision is whether certain life insurance proceeds on the decedent's life are includable in her gross estate either under section 2042[2] or under section 2035. *108 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, oral stipulation of facts, stipulation of agreed adjustments and attached exhibits are incorporated herein by this reference. The decedent, Mildred Eaton Chapman, [3] died testate on or about November 21, 1982, while a domiciliary of the State of Arizona. The estate was administered in the State of Arizona. Linda K. Gordon ("Linda Gordon"), the daughter of the decedent and the personal representative of the Estate of Mildred Eaton Chapman, Deceased, resided in Arizona at the time the petition in this case was filed. The decedent operated a successful wholesale fan business in Phoenix, Arizona, dealing in Hunter Ceiling Fans. The business was called "Kay's Hunter Fans -- Wholesale." On October 16, 1980, the decedent's son, Dennis R. Chapman ("Dennis Chapman"), completed an insurance application to Massachusetts Mutual Life Insurance Company ("Massachusetts Mutual") for a $ 1,000,000 insurance policy on the life of the decedent. *109 [4] At the time Dennis Chapman prepared that application, he was employed by Massachusetts Mutual as an insurance agent. The decedent executed the application for the insurance policy, signing on the preprinted line designated for the signature of the purchaser. The decedent also completed a statement as to the state of her health. The decedent's signature on the line marked purchaser probably was an error and should have been on the line marked proposed insured. [5] The application states that the owner is the decedent's "Business partner," "Dennis R. Chapman." [6] The application for the insurance policy also states that the beneficiary is "Dennis R. Chapman, son." All premium notices and correspondence were to be sent to Dennis Chapman at his home address. The insurance policy on the life of the decedent provided that only the owner could change beneficiaries. As owner of the policy, Dennis Chapman elected the automatic premium loan provision of the policy at the time of application. The election of this provision allowed the premium payments to be paid automatically, by an automatic premium loan if there was enough cash value in the life insurance policy to cover the unpaid premiums. *110 Only the owner of the policy could make this election and only the owner of the policy could take a loan on the policy. On October 26, 1980, Dennis Chapman completed an "Agent's Statement" as part of the application for the life insurance policy on the decedent's life. The Agent's Statement recited that the "Business" would pay the premiums on the policy. However, the business was not identified either as *111 the decedent's business or as one of Dennis Chapman's various businesses. The decedent had only one business checking account, but Dennis Chapman apparently had several business checking accounts. Additionally, the Agent's Statement indicated that the decedent intended the proceeds of the insurance policy on her life to be dedicated to "Mortgage Cancellation," "Estate Liquidity," and "Other Business Needs." Dennis Chapman received a commission for the policy in the amount of $ 22,230.77 for the year 1980 and $ 4,032 for the year 1981. On December 12, 1980, Massachusetts Mutual, after approving the application, issued the convertible $ 1,000,000 insurance policy on the life of the decedent. The monthly premium on the insurance policy was $ 3,459.46. The first two monthly premiums were paid directly to Massachusetts Mutual by Dennis Chapman either from one of his business checking accounts or in cash. [7] The ten subsequent monthly premiums were paid by Dennis Chapman from his business accounts by authorizing Massachusetts Mutual to automatically deduct premiums from those accounts. The particular business accounts were for The Chapman Company, his financial services, insurance, *112 and estate planning business. On January 6, 1981, on a form to change the policy owner's bank account number, Dennis Chapman changed the bank account from which the premium payments were to be deducted. He signed the form as "depositor" and provided Massachusetts Mutual with the new account number as well as a voided check on the new account so Massachusetts Mutual could get the proper coding numbers to debit the account in order to collect the premium payments. In 1981, the decedent issued six checks on her business account (Kay's Hunter Fans -- Wholesale), five checks payable to The Chapman Company and one payable to Dennis R. Chapman, each in the amount of $ 3,459 and each marked "for insurance premiums" or "insurance." The Chapman Company was wholly owned by Dennis Chapman. The decedent had no interest in, or ownership of, The Chapman Company. On December 15, 1981, Dennis Chapman changed the mode of premium payment from monthly to annual payments. On the same date, the annual premium *113 of $ 40,320 for the second year of the policy was paid by a policy loan obtained by Dennis Chapman in the amount of $ 27,018.72 and an amount of $ 13,301.28 paid by Dennis Chapman. The $ 13,301.28 was not paid out of the decedent's business or other bank account, but the record does not show which of Dennis Chapman's business accounts was used to make the payment. Only the owner of the insurance policy could borrow on the policy to pay the policy premiums. If the decedent had contacted Massachusetts Mutual and requested that the beneficiary be changed, Massachusetts Mutual would not have followed her directions or honored her request. All Massachusetts Mutual documents reflected that Dennis Chapman was the owner and beneficiary of the $ 1,000,000 policy on the decedent's life. The record does not establish that Dennis Chapman was acting as an agent of the decedent or in any other fiduciary or representative capacity in regard to the $ 1,000,000 life insurance policy. On Friday, November 5, 1982, the decedent disappeared. [8] On November 7, 1982, Dennis Chapman called his sister, Linda Gordon, to inform her of the decedent's disappearance. Dennis Chapman requested that she meet *114 with him, claiming that he had been advised by his attorneys and accountants that he and his sister should investigate whether there were funds missing from the decedent's accounts or safety deposit boxes. Linda Gordon was the cosigner for the decedent's safety deposit boxes. On Monday, November 8, 1982, Dennis Chapman and Linda Gordon went to the safety deposit boxes and found that no one had entered them. Later that day, Dennis Chapman went back to the safety deposit boxes by using the power of attorney he had obtained from the decedent in 1981. Later on that same Monday, Dennis Chapman visited his sister's home and threw the decedent's will in her lap, saying, "Just face it, Linda, mother's dead." Linda Gordon then became suspicious of her brother's activities because at that time, she had no idea of the mother's whereabouts. Prior to the discovery of the decedent's body, detectives visited Linda Gordon's home and asked her to come to the police station to give a statement regarding her mother's disappearance. The detectives stated that Dennis Chapman was a suspect. While reviewing her mother's papers with the detectives, Linda Gordon noted that those records did not contain *115 a copy of the Massachusetts Mutual insurance policy on the mother's life. [9] Dennis Chapman became a prime suspect in Linda Gordon's opinion a few days after her mother's disappearance, and she immediately took steps to have herself appointed as a conservator of the assets of the mother, a "protected person." On or about November 21, 1982, the mother, decedent herein, was found dead of a gunshot wound to the head, which was not self-inflicted. The decedent was survived by her five children, Cheryl D. Garbart, David E. Chapman, Wendy S. Brawner, Dennis Chapman, and Linda Gordon. The decedent's will named her five children as heirs of her estate and named Dennis Chapman and Linda Gordon as co-executors. *116 After the mother's body was discovered, Linda Gordon took steps to have herself appointed as a Special Administrator of the Estate. After the decedent's death, Massachusetts Mutual received demands from Linda Gordon, in her capacity as Special Administrator of the Estate, as well as from Dennis Chapman, individually, for the proceeds of the $ 1,000,000 insurance policy on the life of the decedent. In March of 1983, Dennis Chapman was indicted by a grand jury for the murder of the decedent and, being unable to raise funds for his bail at that time, remained incarcerated for four months before being released. Ultimately the charges against him were dismissed without prejudice, and the murder remains unsolved. Linda Gordon, in her capacity as Special Administrator of the Estate, instructed her attorney to take steps to prevent the payment of the insurance proceeds to Dennis Chapman because in her mind he was "very suspect" in the murder of the decedent. Linda Gordon instituted a suit on behalf of the estate against Dennis Chapman and Massachusetts Mutual. That suit was filed in the Superior Court of the State of Arizona (Complaint No. C479364) in order to claim the proceeds of *117 the insurance policy. [10] The estate contended that Dennis Chapman feloniously killed the decedent and hence was not entitled to inherit from the estate or to receive any of the proceeds of the $ 1,000,000 insurance policy pursuant to Arizona Revised Statutes section 14-2803. This statute provides that a person who feloniously kills another cannot benefit from that decedent's life insurance policy. After being released from jail, Dennis Chapman filed a tort suit against Linda Gordon and her husband (the Gordons), as well as a petition in the Probate Court to have Linda Gordon removed as personal representative of the estate. Dennis Chapman also instituted a suit against Massachusetts Mutual *118 in order to claim the proceeds of the insurance policy. He filed that suit in the Superior Court of the State of Arizona (Complaint No. C479505). In that complaint, Dennis Chapman contended that as owner and beneficiary of the insurance policy, he was entitled to the $ 1,000,000 proceeds. Massachusetts Mutual responded to the two lawsuits against it by depositing the proceeds of the insurance policy with the clerk of the court. The cases were consolidated and the proceeds of the subject insurance policy were interpled. In its answers, Massachusetts Mutual admitted that Dennis Chapman was the designated owner and beneficiary of the insurance policy. In the Probate Court, the Gordons' counsel contended that the estate would only have to prove by a preponderance of the evidence that Dennis Chapman had feloniously killed the decedent and thus that he was not entitled to any of the proceeds of the policy pursuant to Arizona Revised Statutes Annotated section 14-2803 (1975). An investigative report prepared for Massachusetts Mutual after the decedent's death stated that the beneficiary was the decedent's son, Dennis Chapman, and that the purpose of the insurance was to provide estate *119 planning protection. Dennis Chapman also prepared a memo to the Massachusetts Mutual underwriting department on "The Chapman Company" letterhead that stated, in part, "I will use the proceeds to purchase assets from her estate. I am the owner and beneficiary so that this policy will not be included in her estate." On November 23, 1983, the estate timely filed its Federal estate tax return (Form 706). In the return, the estate reported a total gross estate of $ 649,800. The estate did not report as part of the gross estate the proceeds from the $ 1,000,000 insurance policy on the life of the decedent. On December 9, 1983, the decedent's heirs, Cheryl D. Garbart, David E. Chapman, Wendy S. Brawner, Dennis Chapman, and Linda Gordon (individually and in her capacity as personal representative of the estate) entered into a settlement agreement with regard to the actions brought in the Superior Court for the State of Arizona (Complaints Nos. C479364 and C479505). The heirs agreed that Cheryl D. Garbart, Wendy S. Brawner, David E. Chapman, and Linda Gordon would each receive $ 190,000 from the proceeds of the $ 1,000,000 insurance policy on the decedent's life and that Dennis Chapman *120 would receive the balance of the proceeds, plus interest, totaling $ 303,885.76. The settlement agreement resolved all of the litigation among the heirs, including the actions brought in the Superior Court for the State of Arizona (Complaints Nos. C479364 and C479505) which were dismissed with prejudice, Dennis Chapman's tort complaint against the Gordons, the petition for removal of Linda Gordon as the personal representative of the estate, as well as all other adversarial actions filed in the Probate Court. At the time the settlement agreement was entered into, Dennis Chapman was indebted to his civil and criminal attorneys and to his bank in an amount well in excess of $ 200,000. On October 31, 1986, respondent timely mailed to petitioner a statutory notice of deficiency in the amount of $ 394,144. Respondent determined that the estate improperly failed to include the $ 1,000,000 insurance policy on the decedent's life in the gross estate. Respondent also determined that the $ 31,000 debt due to the First Interstate Bank should have been reported as $ 15,500. [11]
*121 OPINION Section 2042
Section 2042 provides that the gross estate includes (1) the proceeds of insurance on the decedent's life receivable by or for the benefit of the estate, and (2) the proceeds of insurance on the decedent's life receivable by other beneficiaries if the decedent possessed at her death "any of the incidents of ownership" in that insurance policy "exercisable either alone or in conjunction with any other person." Sec. 2042; sec. 20.2042-1(b) and (c), Estate Tax Regs. The term incidents of ownership refers to the right of the insured or her estate to the economic benefits of the policy. Sec. 20.2042-1(c)(2), Estate Tax Regs. Thus, incidents of ownership listed in the regulations include the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy. That listing is not exhaustive. Some powers not listed in the estate tax regulations that have been held to constitute an "incident of ownership" include *122 the power to prevent a change of beneficiary by withholding written consent ( Schwager v. Commissioner,64 T.C. 781, 791 (1975)), and the power to select an optional mode of settlement and thereby vary the time and manner in which the insurance proceeds will be paid. Estate of Lumpkin v. Commissioner,474 F.2d 1092 (5th Cir. 1973), revg. 56 T.C. 815 (1971); but compare Estate of Connelly v. United States,551 F.2d 545 (3rd Cir. 1977). Consideration must be given to the effect of state law upon the terms of the policy to determine who possessed any incidents of ownership in the insurance policy on the decedent's life. Sec. 20.2042-1(c)(5), Estate Tax Regs. Petitioner argues that the estate was entitled to exclude from the gross estate the proceeds of the $ 1,000,000 insurance policy on the life of the decedent because no portion of the proceeds was receivable by the estate or by the executor of the estate. Sec. 2042(1). In addition, petitioner contends that the decedent did not possess any incidents of ownership *123 in the policy nor was the decedent able to confer any economic benefits of the policy at the time of her death. Sec. 2042(2). Respondent counters that the proceeds of the insurance policy were includable in the gross estate because the decedent was the "true owner" of the policy under Arizona law, and Dennis Chapman was merely the decedent's agent, "nominally designated as owner for the sole purpose of excluding the proceeds from the gross estate." In determining whether the decedent possessed any incidents of ownership with respect to the insurance policy, the relevant question is whether the decedent had the capacity to do something to affect the disposition of the proceeds if she so desired. Estate of Smead v. Commissioner,78 T.C. 43, 48 (1982); United States v. Rhode Island Hospital Trust Co.,355 F.2d 7, 11 (1st Cir. 1966). In making that determination, we must, as those cases point out, consider primarily the "policy facts," the rights given in the insurance contract, rather than the insured's subjective intentions. It is the existence of the *124 power, not the probability of its exercise, that controls. Schwager v. Commissioner, supra,64 T.C. at 791. As the insurance contract was executed in the State of Arizona by Dennis Chapman, an Arizona resident, and Massachusetts Mutual, which maintained a place of business in Arizona, Arizona law will govern the interpretation of that contract. Under Arizona law, the "mere form" of a life insurance contract is not conclusive on the issue of ownership; nor is the named owner of the insurance policy determinative of the question of who is the actual owner. Moser v. Moser,572 P. 2d 446, 448 (Ariz. App. 1977); Neely v. Neely,563 P. 2d 302, 306 (Ariz. App. 1977). The surrounding facts and circumstances must be examined in the determination of ownership. Moser v. Moser, supra at 448. Here, however, respondent's argument fails because the facts and circumstances show that Dennis Chapman was the owner of the insurance policy on the life of the decedent. Both the insurance contract and a Massachusetts Mutual representative *125 identified Dennis Chapman as the owner of the insurance policy on the life of the decedent. Here, the application for insurance names Dennis Chapman as the owner and beneficiary of the insurance policy on the decedent's life. All premium notices and correspondence were sent to Dennis Chapman at his home address. The insurance contract provided that only the owner as designated on the application, Dennis Chapman, could change the beneficiaries. As owner of the policy, Dennis Chapman elected the automatic premium loan provision on the policy, thereby obtaining from the insurer, Massachusetts Mutual, a loan against the surrender value of the policy. A Massachusetts Mutual representative testified, and we have found as a fact, that only the owner of the policy could have made this election and only the owner of the policy, Dennis Chapman, could have taken a loan on the policy. Dennis Chapman actually paid the premiums, changed the method of premium payment by changing the bank account from which the payments on the insurance policy were to be withdrawn, and changed the mode of payment from monthly to annual. Additionally, a Massachusetts Mutual representative testified, and we have *126 found as a fact, that if the decedent had requested that the beneficiary be changed, Massachusetts Mutual would not have followed the decedent's directions because Dennis Chapman, not the decedent, was the owner of the policy. Thus, the decedent did not possess any incidents of ownership which would require the inclusion of the proceeds of the $ 1,000,000 insurance policy on her life in the gross estate pursuant to section 2042(2). Respondent also argues that the proceeds were receivable by or for the benefit of the estate. The policy was owned by Dennis Chapman and controlled at his discretion. There is no evidence of any legally binding commitment that obligated him to provide any of the proceeds to the estate. Thus, the proceeds could not have been receivable by or for the benefit of the estate. Sec. 2042(1). Contrary to respondent's contentions, the record simply does not establish that the decedent was "the true owner" of the policy or that Dennis Chapman was acting as an agent or other fiduciary or representative of the decedent in regard to that policy. Respondent also contends that the proceeds of the life insurance policy were constructively received by the estate *127 through the settlement agreement. Respondent argues that the settlement agreement substantially allowed each of the beneficiaries of the decedent's estate approximately $ 40,000 more of the proceeds of the insurance policy than they would have received had the policy proceeds been included in the gross estate. Therefore, respondent concludes that the Court should look through the form of the transaction and hold that the proceeds were constructively received by the estate. However, respondent's argument is based on sheer surmise and speculation. There is no evidence that the beneficiaries were influenced by tax considerations in arriving at their settlement. There is evidence that Dennis Chapman and the other beneficiaries of the estate of the decedent may have been motivated by their litigating risks when they executed the settlement agreement. Dennis Chapman was indebted to his civil and criminal attorneys as well as his bank for more than $ 200,000. The other beneficiaries of the estate had expressed fear that Dennis Chapman would flee the area. [12] Additionally, the estate's counsel contended at the settlement conferences that the other heirs of the estate would have to prove *128 by only a preponderance of the evidence that Dennis Chapman was responsible for the felonious killing of the decedent, thereby precluding any receipt by him of any of the policy proceeds. See Ariz. Rev. Stat. Ann. sec. 14-2803 (1975). Additionally, there was a plethora of litigation surrounding the policy proceeds that had been interpled by Massachusetts Mutual. Considering the adverse and conflicting interests of the various heirs, it is quite improbable that the heirs of the estate crafted their settlement agreement so as to avoid the payment of estate tax. There were many other motivations among the parties that brought this settlement agreement to fruition. Thus, there are no facts or circumstances to support respondent's theory or to indicate that the proceeds of the policy on the decedent's life should be included in the gross estate under section 2042. Section 2035
Section 2035(a) generally provides that the gross estate of the decedent includes *129 the value of any property in which the decedent had an interest and had transferred within three years of death. Section 2035(b) excepts bona fide sales for adequate and full consideration and gifts for which gift tax returns need not be filed (except any transfer with respect to a life insurance policy). Section 2035(d), which applies to decedents dying after 1981, was added by the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, sec. 424, 95 Stat. 172, 317. [13] The decedent died in 1982, so section 2035(d) applies to her estate. Section 2035(d)(1) provides that the general rule of section 2035(a) shall not apply to the estate of a decedent dying after December 31, 1981, except in cases of those transfers enumerated in section 2035(d)(2). Section 2035(d)(2) excepts transfers of an interest in property which is included in the value of the gross estate under section 2042 (or various other sections) [14] or which would have been included under any of those sections "if such interest had been retained by the decedent." Thus, as applicable herein, section 2035(a) would apply if the *130 policy proceeds either (1) were included in the value of the gross estate under section 2042, or (2) would have been included in the gross estate under section 2042, had such an interest been retained by the decedent. Sec. 2035(d)(2). In other words, unless section 2035(d)(2) is applicable to the proceeds of the policy, section 2035(d)(1) will apply to the proceeds and consequently preclude the application of section 2035(a). Alternatively, if section 2035(d)(2) does apply, then section 2035(a) would become applicable. Petitioner asserts that the decedent never possessed any incidents of ownership and that the inapplicability of section 2042 to the policy *131 proceeds precludes the application of section 2035(d)(2), because the decedent never had any interest to transfer in any event. However, respondent contends that the decedent purchased the policy in the name of Dennis Chapman and paid the premium for it within three years of her death, constituting a transfer of the policy proceeds within the purview of section 2035, and thus bringing the proceeds of the policy on the decedent's life into the gross estate. We agree with petitioner. We reject respondent's factual premise. The record does not show that the decedent "purchased the policy" or paid the premiums for the policy.[15] Also, we have already found that the decedent never possessed any incidents of ownership and that the proceeds of the policy would not have been includable in the gross estate under section 2042. Thus, the exception in section 2035(d)(2) is inapplicable to the proceeds of the policy. Estate of Leder v. Commissioner,89 T.C. 235 (1987), on appeal (10th Cir., Jan. 11, 1988). The proceeds of the insurance policy on the decedent's life are not includable under section 2035(a) because section 2035(d)(1) applies so as to preclude consideration *132 of the three-year rule. As in Estate of Leder v. Commissioner, supra,section 2035(d)(1) overrides section 2035(a) and hence we do not reach the issue of whether there was a transfer within the meaning of section 2035(a). 89 T.C. at 238. In essence section 2035(d)(1) does away with the three-year-transfer rule (the last vestiges of the old contemplation of death rule) for decedents dying after December 31, 1981. Thus, unless the property is otherwise includable in the gross estate under sections 2036, 2037, 2038, or 2042, one need not consider section 2035 at all for decedents dying after December 31, 1981. Accordingly, we do not reach and need not discuss the "beamed transfer" theory developed prior to the enactment of section 2035(d). See Bel v. United States,452 F.2d 683 (5th Cir. 1971); Estate of Kurihara v. Commissioner,82 T.C. 51 (1984); Estate of Ronk v. Commissioner,T.C. Memo. 1988-432. Factually, the decedent never had any property interest in *133 the insurance policy to transfer, and the facts also show that the decedent did not "transfer" the policy in this case. Therefore, we hold that under both section 2042 and section 2035(d)(1) the proceeds of the insurance policy are not includable in the gross estate. To reflect the parties' stipulations of agreed adjustments and the above holdings, Decision will be entered under Rule 155.
Footnotes
1. The parties executed a stipulation of agreed adjustments, reflecting various concessions and agreements. They agreed that the gross estate would be reduced by $ 59,056 to reflect a judgment granted in the Superior Court of Arizona in favor of Arthur Mead. In addition, the parties agreed to a reduction of $ 5,166 to reflect adjustment made to the fair market value of certain real and personal property sold subsequent to the decedent's death. The parties also agreed to reduce the value of the gross estate by $ 55,977 to reflect expenses paid with respect to the sale of the above-mentioned property. Additionally, respondent has conceded that the gross estate should be further reduced in the amount of $ 100,060 to reflect additional expenses incurred by the estate for attorney, personal representative, and accounting fees. See also n.11, infra.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect as of the date of the decedent's death, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
3. The decedent has also been known as Mildred E. Eaton Chapman, Kay Mildred E. Chapman, and Kay M. Chapman.↩
4. The decedent owned another life insurance policy with a face amount of $ 50,000, issued by New York Life payable to her estate. That insurance policy is not at issue in this case. ↩
5. A Massachusetts Mutual representative testified at trial that the insured oftentimes signs on the line of purchaser, instead of insured. The Court's examination of that portion of the application form shows that because of the peculiar spacing and arrangement of printed lines, the line on which the decedent signed would appear at first glance to be the line for the proposed insured. ↩
6. Other than his employment as an insurance agent, Dennis Chapman had a number of businesses. However, his mother was involved in only one business venture with him, the promotion of certain singers.↩
7. Massachusetts Mutual does not keep records to indicate whether the payment was made by currency or check, both checks and currency being treated as "cash" by the insurance company.↩
8. The findings surrounding the decedent's disappearance are largely based on the testimony of Linda Gordon at trial. Dennis Chapman was unavailable to testify. His family, his attorney, the police, and the counsel in this case have not been able to locate him for several years. ↩
9. Linda Gordon had never seen the policy until just shortly before the trial of this case in the Tax Court. The record does not indicate whether or not the decedent had ever had possession of the policy.↩
10. That complaint alleged, among other things, that Dennis Chapman held the insurance policy as a constructive trust. However, the complaint was prepared by Linda Gordon's attorney without consulting her and was not a verified complaint. Therefore, when considering the complaint in the context of the other evidence presented, we give its allegations little weight. See generally Contractor Utility Sales Co. v. Certain-Teed Products Corp.,638 F.2d 1061↩ (7th Cir. 1981).
11. The parties in the stipulation of agreed adjustments have now agreed that the estate is entitled to deduct from the gross estate the liability of $ 31,000 due to the First Interstate Bank. See n.1, supra,↩ for other agreed adjustments.
12. In fact, Dennis Chapman was unavailable for the trial of this case and none of the parties or attorneys could locate him.↩
13. For a brief review of the earlier historical changes to section 2035 from a contemplation-of-death standard to a flat three-year rule, see Estate of Ronk v. Commissioner,T.C. Memo. 1988-432↩. 14. Section 2035(a)↩ would also be applicable if the policy proceeds were includable in the gross estate pursuant to sections 2036 (transfers with retained life estates), 2037 (transfers taking effect at death), or 2038 (revocable transfers). There is no contention that any of these sections apply in this case.
15. At best the decedent may have reimbursed Dennis Chapman or The Chapman Company for six of the 12 monthly premiums paid in 1981.↩