**ESTATE of James H. LUMPKIN, Jr., Deceased.**
**Christine T. HAMILTON, Executrix, Petitioner-Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

No. 72–1298.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1973.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., U. S. Dept of Justice, Lee H. Henkel, Jr., Acting Chief Counsel, Edward D. Robertson, K. Martin Worthy, Chief Counsel, I.R.S., Gary R. Allen, Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellant.

Rudy M. Groom, Melvin M. Engel, Houston, Tex., for petitioner-appellee.

Before GEWIN, THORNBERRY and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

This federal estate tax case squarely presents the question of whether an employee who under the provisions of a group term life insurance policy is given nothing more than the right to alter the time and manner of enjoyment of the proceeds possesses an "incident of ownership" with respect to that policy so that at his death the value of the proceeds must be included in his gross estate under § 2042 of the Internal Revenue Code of 1954.[1] Decedent, James H. Lumpkin, Jr., died on March 15, 1964. After his estate's tax return was received, the Commissioner of Internal Revenue assessed a deficiency because the value of the proceeds from a group term life insurance policy covering Lumpkin's life were not included in his gross estate. Lumpkin's estate brought this action in the United States Tax Court to contest the Commissioner's deficiency determination. The Tax Court decided that § 2042 does not require the value of the proceeds to be included in decedent's gross estate,[2] and the Commissioner has appealed. We reverse.

At the time of his death Lumpkin was an employee of the Humble Oil & Refining Company (hereinafter Humble) and as such was covered by a non-contributo-

---

1. 26 U.S.C. § 2042. § 2042 provides in pertinent part that:
    "The value of the gross estate shall include the value of all property—
    (2) *Receivable by other beneficiaries.*
    —To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. . . ."

2. The Tax Court's decision is reported at 56 T.C. 815 (1971).

ry group term life insurance policy issued to Humble for the benefit of selected employees by the Equitable Life Assurance Society of the United States. According to the terms of the policy, which were communicated to covered employees in a booklet Humble had prepared and distributed, two kinds of benefits were payable to survivors of covered employees who died while serving Humble, but of these only one is relevant to our inquiry, the "Contingent Survivors Group Life Insurance Coverage."

Benefits receivable under "Contingent Coverage" consisted of a lump sum payment of $200, to be paid immediately upon the employee's death, plus a series of monthly payments, each in the amount of half the employee's normal monthly compensation, to continue over a period the duration of which depended upon the number of full years of service the deceased employee had completed. The "Contingent Coverage" benefits were to be paid to one of the following classes of qualifying [3] "preference relatives" in descending order of priority: (1) spouse, (2) children under 21 years of age or permanently incapable of self-support, and (3) parents. The order in which the employee's survivors succeeded to the right to receive the proceeds from the "Contingent Coverage" was irrevocably fixed; under no circumstances could the employee redetermine who the beneficiaries would be or the order of priority among them. Thus upon the employee's death his spouse was to receive the lump sum and the monthly installments; if there were no surviving spouse, the payments would be divided equally among any surviving members of the class next in priority, i. e. children. If there were no children, the payments would be divided among mem-

bers of the group lowest in priority, i. e. parents. Similarly, if the spouse were to die before all earned payments had become due, the remaining installments would be divided among any surviving children or, if none, among any surviving parents. Payments were to cease as soon as there were no more survivors from the list of qualifying preference relatives; as a result it was never certain that all monthly installments earned by the employee would actually have to be disbursed.

We now come to the "Optional Modes of Settlement" provision exercisable in connection with the "Contingent Coverage" benefits, the provision said by the Commissioner to bring § 2042 into play. One part of the optional settlement provision entitled the employee to elect, without the consent of any other person, to have any monthly installments becoming payable to his spouse in effect reduced by half.[4] The insurer would then accumulate the unpaid balance of each monthly installment with interest into a fund, and, in the event all monthly installments earned by the employee were paid to the spouse, the fund would be used to continue reduced monthly payments to the spouse until it was exhausted. If the spouse were to die before the fund was consumed, the amount remaining in it would be paid to her estate in a lump sum. But in no event would her estate receive more than what was in the accumulated fund. If the spouse were to die before all monthly installments earned had become due, the remaining installments would still be paid to surviving members of the next priority of preference relatives as previously outlined. Thus this part of the optional settlement provision enabled the insured employee to extend the period of time over which monthly payments

---

3. "Qualifying" is defined in the booklet as those "preference relatives" either living with the covered individual or receiving support from him to the extent of at least 20% of the amount the covered individual was last receiving as an employee or annuitant.

4. Actually if this option were elected the payments would be further reduced by the amount of any Social Security benefits available to the spouse.

would be made to his spouse and consequently to reduce them in amount. It did not empower him to divest her of any portion of the proceeds to which she (or her estate) was entitled under the terms of the preference relative provisions.

In addition to offering the employee this specific optional mode of settlement, the optional settlement provision entitled him, upon obtaining the approval of his employer and the insurer, to establish any other scheme he might devise for the disbursement of the proceeds once they became payable to a particular rela-

tive. The exercise of this more general part of the optional settlement provision was also limited in that under it the employee still could not rearrange the order in which his preference relatives succeeded to the right to receive monthly installments and hence could not divest any preference relative of the share of the proceeds to which he was entitled. The optional settlement provision concluded with the stipulation that under it the employee had no right to designate beneficiaries either by request or by assignment but that he could assign all rights given to him by the policy.[5]

---

5. The complete terms of the optional settlement provision are set out in the booklet as follows:

Optional Modes of Settlement

A covered individual may elect that only a portion of each monthly installment becoming payable to his spouse in accordance with the foregoing provisions of this Part 2 be paid on its due date. Such portion shall be equal to 25% of the covered individual's monthly normal compensation reduced in the case of a covered annuitant by the total amount of benefits available (other than a lump sum payment) to his spouse and any children in her care under the U.S. Social Security Act as it reads at the time the covered annuitant dies, provided, however, that the portion so payable shall not be less than 10% of the covered annuitant's monthly normal compensation. This election shall be made by the covered individual during his lifetime by proper written request submitted to the Society on a form furnished by or acceptable to the Society.

\*     \*     \*     \*     \*

In the event the election pursuant to the foregoing shall have been made, the balance of each monthly installment payable to the spouse shall be held by the Society and accumulated as a fund, with interest credited at the effective rate authorized from time to time by the Board of Directors of the Society but at an effective rate of not less than 2½% per annum, subject to the further provisions hereof. Such interest shall be credited at the end of each month on the average balance remaining in the fund after the first day of such interest period. In the event the spouse receives the maximum number of monthly installments provided with respect to the covered individual by the foregoing pro-

visions of this Part 2, the fund shall, except as hereinafter provided, be applied to continue monthly installments to the spouse, each in an amount determined on the same basis as the portion of the monthly installment paid to the spouse on its due date under the election, until the fund is exhausted, the first additional monthly installment becoming payable one month after the last monthly installment becomes due. In the event the spouse dies at any time while there is an amount in such fund, such amount shall be payable without further accrual of interest in one sum to the executors or administrators of such spouse's estate.

An election other than that specified above may be arranged during the lifetime of a covered individual with respect to monthly installments becoming payable to the covered individual's preference relatives if the covered individual, the employer by whom employed and the Society mutually agree thereon.

\*     \*     \*     \*     \*

Benefits payable under this policy with respect to any covered individual shall be payable only to the person or persons entitled thereto pursuant to the provisions of Part 1 and Part 2 of the section entitled "Group Life Insurance Benefits." A covered individual shall have no right to designate a person or persons to receive any benefits payable under this policy either by request, assignment or by any other means, but may assign or transfer all rights he may possess under this policy. Once such an assignment or transfer has been made the assignee or transferee shall have the sole right to exercise all of the rights under this policy granted the covered individual. Benefits payable under this policy with respect to any covered individual shall

Before proceeding any further we should delineate the exact nature of the power that was conferred upon Lumpkin by the provision entitling him to elect optional modes of settlement, the only provision in the entire policy which gave him any control over the proceeds. By exercising his rights under this provision Lumpkin could not benefit himself or his estate, nor could he designate who the beneficiary of the proceeds would be. What the optional settlement provision did give him the right to do was to vary the time and manner in which the proceeds would be paid to the policy-designated beneficiaries after his death. For instance, if he exercised the option in the provision specifically dealing with his spouse's settlement, she would be denied early enjoyment of approximately one half of each monthly installment, and her eventual enjoyment of the accumulated fund would be conditioned upon her living past the date when the last monthly installment became due. Similarly by exercising the other option in the provision, which contained no limitation as to the form of settlement that could be arranged but which required the consent of the employer and the insurer, Lumpkin could extend or diminish the period over which payments were to be made to the spouse or any of the other beneficiaries selected by the policy, consequently either enlarging or reducing them in amount. In short the right to elect optional modes of settlement gave Lumpkin a degree of control over the time when the proceeds of the policy would be enjoyed and nothing more.

§ 2042 is the statute in the federal estate tax scheme under which the value of life insurance proceeds is taxed to the estate of the insured. With respect to proceeds receivable by beneficiaries other than the insured, it is triggered only if at death the insured possessed any "incidents of ownership" in the insurance. When the "incidents of ownership" term first appeared as part of an amendment to § 2042's predecessor,[6] no definition accompanied it; however, Congress, in its committee reports, did include an illustrative list of the kinds of rights comprehended by the phrase. Among these were the right of the insured to the economic benefits of the insurance, the right to change beneficiaries, the righ to surrender or cancel the policy, the right to assign the policy, the right to pledge the policy for a loan, and others.[7]

From this list it can be inferred that by using the "incidents of ownership" term Congress was attempting to tax the value of life insurance proceeds over which the insured at death still possessed a substantial degree of control.[8] This inference is strengthened if we recognize that by enacting § 2042 Congress intended to give life insurance policies estate tax treatment roughly equivalent to that accorded other types of property under related sections of the Code.[9] Under §§ 2036 (transfers with retained life estate), 2037 (transfers taking effect at death), 2038 (revocable transfers), and 2041 (powers of appointment) substantial control is often the touchstone by which the determination is made that in-

not be assigned by any of his beneficiaries, and, to the extent permitted by law, shall not be subject to garnishment, attachment, execution or levy of any kind.

6. The Revenue Act of 1942, ch. 619, § 404, 56 Stat. 798, *amending* the Internal Revenue Code of 1939, § 811(g).

7. H.R.Rep. No. 2333, 77th Cong., 2d Sess. 163 (1942) and S.Rep. No. 1631, 77th Cong., 2d Sess. 235 (1942). The Treasury must have relied on this legislative history in promulgating its regulation

under § 2042(2) because in them a list virtually identical to that set forth in the Committee reports is used to demonstrate what rights are considered "incidents of ownership." Treas.Reg. § 20–2042–1(c) (2) (1958).

8. *See* United States v. Rhode Island Hospital Trust Company, 355 F.2d 7, 10 (1966).

9. That Congress had such an intent with respect to § 2042 has been recognized in Skifter v. Commissioner, (2d Cir. 1972), 468 F.2d 699.

clusion is necessary. Of course Congress knew that control can be, and often is, exercised by one not having complete legal and equitable title—hence the term *"incidents* of ownership." As the First Circuit has said: "The very phrase 'incidents of ownership' connotes something partial, minor, or even fractional in its scope. It speaks more of possibility than of probability." [10]

■■■ The question before this court is whether the right to alter the time and manner of enjoyment, a fractional right to be sure, affords its holder the kind of control over the proceeds that will make it an "incident of ownership" within the meaning of § 2042(2). The Tax Court thought not. In reaching this decision it relied on an earlier Board of Tax Appeals case which to our knowledge is the only one in which the question has been considered. In Billings v. Commissioner [11] the decedent had a right to elect optional modes of settlement similar to that conferred upon Lumpkin by the group term policy in this case; the Tax Court's predecessor held that the right to determine when the proceeds should be paid to the beneficiary was too limited and insignificant to amount to control over the proceeds.

To offset the impact of this 1937 decision, the Commissioner relies upon two relatively more recent Supreme Court decisions. In Lober v. United States [12] the decedent had created three separate irrevocable trusts, one for the benefit of each of his three minor children. Although the trust instruments gave each child a "vested interest" under state law so that if one of them had died after creation of the trusts respective interest would still have passed to his estate, the decedent as trustee had retained the right to turn all or any part of the principal trusts over to the beneficiaries at any time he saw fit. Thus Lober had forsaken the right to determine who the beneficiaries of the trust would be but had retained the right to determine when the trust property would be enjoyed. The court held that retention of this right rendered the value of the trust property includible in Lober's gross estate under the forerunner to § 2038; that section, as does § 2038, required the inclusion of the value of all property that the decedent had previously transferred in trust but over the enjoyment of which he had retained the power to "alter, amend, revoke or terminate." [13] In reference to Lober's right to alter the time of enjoyment, the court said: " '[A] donor who keeps so strong a hold over the actual and immediate enjoyment of what he puts beyond his own power to retake has not divested himself of that degree of control which § 811(d)(2) requires in order to avoid the tax.' " [14]

In essence United States v. O'Malley, [15] the second case relied upon by the Commissioner, is not substantially different from *Lober.* The decedent Fabrice created several irrevocable trusts for the benefit of different members of his family. As one of the trustees he was empowered to pay the trust income to the

---

10. United States v. Rhode Island Hospital Trust Company, 355 F.2d 7, 10 (1966).

11. B.T.A. 1147 (1937), acq. 1937–2 Cum. Bull, 3. Although it has since been withdrawn, the Commissioner's acquiescence in the *Billings* case remained outstanding at the time taxpayer filed its return and at the time the litigation commenced, and at oral argument the taxpayer argued that its justifiable reliance upon this acquiescence estopped the Commissioner from reversing his position retroactively. But it is well-established law that the Commissioner has plenary power to modify, amend or revoke his acquiescences and to

make suit changes retroactively as to all taxpayers or, in the exercise of his discretion, certain classes of taxpayers. Dixon v. United States, 381 U.S. 68, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965).

12. 346 U.S. 335, 74 S.Ct. 98, 98 L.Ed. 15 (1953).

13. Internal Revenue Code of 1939, § 811 (d)(2).

14. Lober v. United States, 346 U.S. 335, 337, 74 S.Ct. 98, 100, 98 L.Ed. 15 (1953).

15. 383 U.S. 627, 86 S.Ct. 1123, 16 L.Ed. 2d 145 (1966).

beneficiaries or to accumulate it and add it to the principal, in which event the beneficiaries would be denied the privilege of immediate enjoyment and their eventual enjoyment would be conditioned upon their surviving the termination of the trusts. Thus Fabrice also had the right to alter the time and manner of enjoyment; however, the control afforded him by this right was somewhat less than Lober had possessed because it extended to the trust income only and not the principal which was inalterably committed to pass to the beneficiary (or his estate) when the trust terminated.[16] Nevertheless the Supreme Court held that O'Malley's power over the time and manner of enjoyment was significant and of sufficient substance to activate the predecessor to § 2036 [17] which required inclusion whenever the transferor of property in trust had retained the right to "designate" who was to enjoy it.

Quite clearly the lesson to be drawn from *Lober* and *O'Malley* is that the right to alter the time and manner of enjoyment does give its holder a substantial degree of control, at least insofar as §§ 2036 and 2038 are concerned. In view of the Congressional intention to make the estate tax treatment of life insurance roughly analogous to that bestowed upon other types of property, somewhat of an anomaly would be created if power over the time and manner of enjoyment was said to impart enough control to activate §§ 2036 and 2038 yet not enough to make it an "incident of ownership" within the context of § 2042.

The only significant distinction between §§ 2036 and 2038 on the one hand and § 2042 on the other is that under the former there must be an incomplete transfer by the decedent whereas under the latter a transfer is unnecessary. Thus under §§ 2036 and 2038 the decedent must have *retained* some control over property he initially transferred while under § 2042 it is enough if at death the decedent merely *possessed* an incident of ownership, the means by which he came into possession being irrelevant.[18] This distinction does not, however, suggest that there is a further difference among these sections of the estate tax as to the degree of power a decedent must hold over the property in question—whether it be life insurance or some other form of wealth—in order to render its value includible in his gross estate.

These sections are all part of a Congressional scheme to tax the value of property transferred at death, whether the decedent accomplishes the transfer by will, by intestacy, or by allowing his substantial control over the property to remain unexercised until death so that the shifting of its economic benefits to the beneficiary only then becomes complete. It is the lapse of substantial control at death that triggers their application. *Lober* and *O'Malley* teach that one endowed with power over the time of enjoyment has the kind of substantial control Congress intended to reach by enacting these sections. Because the control it affords is substantial, we conclude that a right to alter the time of enjoyment such as that conferred upon Lumpkin by the optional modes of settlement provision in this case is an "incident of ownership" under § 2042(2). Lumpkin could easily have assigned the right to elect optional settlements, thereby completely divesting himself of control over the insurance proceeds and

---

16. The district court held that the original corpus of the trusts was includible in the estate, and that holding was not challenged on appeal.

17. Internal Revenue Code of 1939, § 811(c) (1)(B)(ii).

18. *See* Commissioner v. Noel, 380 U.S. 678, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965) and Karagheusian v. Commissioner, 23 T.C. 806 (1955), rev'd on other grounds 233 F.2d 197 (2d Cir. 1956). *But cf.* Skitfer v. Commissioner, No. 72-1445 (2d Cir., 1972) 468 F.2d 699 and Fruehauf v. Commissioner, 427 F.2d 80 (6th Cir. 1970).

avoiding inclusion of their value within his gross estate. Since he did not, his estate must suffer the consequences.

The Tax Court erroneously held that at his death Lumpkin possessed no incidents of ownership with respect to this group term life insurance policy. Its judgment is vacated, and the case is remanded with instructions to enter judgment for the Commissioner.

Vacated and remanded.