*Decisions will be entered under Rule 155.*

ESTATE OF HARRY BLOCH, JR., DECEASED, FIRST WISCONSIN TRUST COMPANY, PERSONAL REPRESENTATIVE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2667–78.     Filed May 25, 1982.

*Gerald J. Kahn*, for the petitioner.
*Edward J. Roepsch*, for the respondent.

## OPINION

FEATHERSTON, *Judge*: Respondent determined a deficiency in the amount of $419,942.46 in petitioner's estate tax. After concessions by the parties, the only issue remaining for

---

decision is whether decedent, who was trustee of a trust created by his father, possessed at the time of his death any "incidents of ownership" in three entrusted insurance policies on his life with the result that the insurance proceeds are includable in his gross estate under section 2042(2).[1]

## 1. Basic Facts

All the facts are stipulated.[2]

Decedent died testate on September 19, 1973. He was survived by his second wife (Noreen), by three children (Robert H., James G., and Richard E.) from his first wife (Ruth), and by two adopted children (Richard and Deborah). At the time the petition was filed, the First Wisconsin Trust Co., with its principal office in Milwaukee, Wis., was serving as sole personal representative of decedent's estate. Decedent's estate tax return was filed with the Midwest Service Center, Kansas City, Mo.

On or about December 2, 1946, decedent's father, Harry Bloch, Sr., as grantor, entered into an agreement with decedent, as sole trustee, establishing the "Robert H. and James G. Bloch Trust" (the 1946 trust). Decedent continued to serve as trustee of the 1946 trust until his death.

On December 7, 1946, Herman Silverstein established an irrevocable trust (the Silverstein trust) naming the decedent as sole trustee. Pursuant to the Silverstein trust agreement, Mr. Silverstein paid $14,389.95 to decedent as trustee, and he placed these funds in the 1946 trust. Under the terms of the Silverstein trust agreement: (1) Mr. Silverstein was to receive a $160-per-month annuity for life; (2) decedent as trustee was required to pay Mr. Silverstein's hospital and funeral expenses; (3) upon Mr. Silverstein's death, any remaining property of the Silverstein trust was to be distributed to the 1946 trust; and (4) decedent personally guaranteed the annuity payments to Mr. Silverstein in the event the Silverstein trust estate was insufficient to make the payments.

Also, on December 7, 1946, Mr. Silverstein designated

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

[2] This case was originally submitted to Judge Sheldon V. Ekman who died Jan. 18, 1982. It was reassigned by order to Judge C. Moxley Featherston.

decedent in his capacity as trustee of the 1946 trust as the sole beneficiary of two insurance policies on Mr. Silverstein's life in the total face amount of $10,000. As a result of the Silverstein transactions, the 1946 trust received a total of $24,389.95 (cash of $14,389.95 and $10,000 on Mr. Silverstein's death) and disbursed for all purposes of the Silverstein trust a total of $33,422.63. The disbursements thus exceeded receipts by $9,032.68.

In addition to receipts from the Silverstein trust transactions, the 1946 trust received funds in excess of $242,000 from several sources, including Harry Bloch, Sr. (the grantor, decedent's father), Harry Bloch, Jr. (decedent), Hannah Bloch (decedent's aunt), Ruth J. Bloch (decedent's first wife), and the Dayton trust. The Dayton trust was established by Myrtle E. Bloch (decedent's mother) on February 25, 1953, and 17 percent of its income was to be distributed to the 1946 trust. At decedent's death, the 1946 trust owed decedent $9,164.51 and owed the Dayton trust $1,000.

By the terms of the 1946 trust agreement, the trustee was to hold the trust estate "for the benefit of Robert H. Bloch and James G. Bloch and any other children of * * * [decedent] now or hereafter born, equally, and their issue, per stirpes." The trustee was authorized to acquire, among other things, life insurance policies upon the lives of the beneficiaries and any other person in whom they had an insurable interest. During the lifetime of decedent and until the youngest of his sons reached the age of 25 years, the trustee was to use as much of the net income of the 1946 trust as was necessary to pay any life insurance premiums and was to accumulate the balance. The trust agreement provided that the trust would terminate upon the death of decedent or when the youngest of his sons reached the age of 25 years after decedent's death.

The trust agreement vested the trustee with power to manage and control any insurance policies owned by the 1946 trust to the same extent he would have as absolute owner, including the power to pledge them for loans. Decedent's father as grantor of the 1946 trust reserved the right to designate a successor trustee in the event the trustee died or resigned. A successor trustee would succeed to all the rights, powers, and obligations of the deceased or resigned trustee. The trustee was exculpated from liability by reason of any loss

or diminution of value in the trust estate, except when the trustee did not act in good faith or with reasonable care.

On or about February 7, 1947, decedent as trustee of the 1946 trust applied to Prudential Insurance Co. of America (Prudential) for two insurance policies on his life, each in the amount of $100,000. On or about February 8, 1947, these two policies, each calling for annual premiums of $1,922 for the first 3 years and $2,261 thereafter, were issued to the 1946 trust in accordance with decedent's application. On October 26, 1953, decedent as trustee submitted an application to Prudential for a policy on his life in the amount of $150,000, and the policy, calling for annual premiums of $3,660, was issued to the 1946 trust in accordance with the application. The Prudential policies gave their legal owner (the 1946 trust) certain rights, including the rights to receive dividends, obtain loans, surrender the policies, change beneficiaries, assign the policies outright or as collateral for loans, and select the mode of settlement of the proceeds.

Beginning February 16, 1967, decedent (in his individual capacity) executed a series of collateral pledge agreements and a personal guaranty in connection with loans made by First Wisconsin National Bank (hereinafter the bank) to Bloch-Daneman Co., a corporation of which he was an officer, director, and 50-percent shareholder. On July 23, 1969, following pressure from the bank for more collateral, decedent as trustee of the 1946 trust executed assignments of the 1946 trust's three Prudential life insurance policies as collateral security for the obligations of Bloch-Daneman Co. to the bank. The assignments were for the personal benefit of decedent, and for the benefit of the corporation, not for the benefit of the beneficiaries of the 1946 trust. The bank did not receive any written authorization from the trust's beneficiaries with regard to these assignments, nor did decedent receive any court approval therefor.

On or about June 30, 1970, decedent decided to liquidate Bloch-Daneman Co. by selling the assets of the business. In order to pay creditors and sell the inventory, decedent borrowed additional sums from the bank on behalf of the corporation and as an individual. All of this indebtedness was secured by the cash surrender value of the three Prudential life insurance policies and decedent's personal guaranty.

As early as October 8, 1971, the bank raised a question as to the propriety of accepting the entrusted insurance policies as collateral for the corporation's indebtedness. Decedent's attorney suggested that the corporate obligation be transferred to decedent's name. However, on December 6, 1971, the bank informed decedent that its attorneys had doubts as to whether the 1946 trust's insurance policies could legally be pledged to secure decedent's note and suggested that he pledge other collateral. Decedent responded by again suggesting that the corporation's name be taken off the note. On October 19, 1972, the bank advised that "our attorneys are of the opinion that a pledge of trust assets to secure personal indebtedness of the administrator could be questioned by the courts" and suggested alternative arrangements. The matter had not been resolved when decedent died.

On January 8, 1974, after decedent's death on September 19, 1973, the bank filed a claim against decedent's estate in the amount of $112,300 (plus interest) with respect to the corporate note of Bloch-Daneman Co. and two personal notes of decedent. The claim was allowed with minor modifications, and the collateral other than the 1946 trust's insurance policies was liquidated and applied on the claim.

On June 4, 1974, the County Court of Milwaukee County appointed Robert H. and James G. Bloch as successor trustees of the 1946 trust. A claim was filed against decedent's estate on behalf of the 1946 trust on the theory that decedent had diverted trust assets by pledging the three Prudential insurance policies to secure indebtedness of decedent and Bloch-Daneman. After a hearing, the County Court ruled that the claim should be held open as a contingent claim until the final distribution of decedent's estate in order to ascertain whether the 1946 trust sustained any loss as a result of the pledge. The bank and the successor trustees agreed that $100,000 of the insurance proceeds would be deposited in a special account pending distribution of the estate, and the remainder of the proceeds were to be released to the trust.[3] The estate ultimate-

---

[3] The records of the bank include a memorandum dated Nov. 15, 1973, which states: "As we do not have proper assignments of this collateral and have found that it was beyond Mr. Block's [sic] power to pledge these trust assets, we wanted to talk" with the successor trustees about arrangements to protect the bank's claim.

ly proved to be solvent, and the $100,000 was released to the successor trustees.

## 2. *Contentions of the Parties*

Section 2042, adopted as part of the 1954 Code, substantially revised the prior standard for the includability of life insurance in a decedent's gross estate. The test under prior law that the insurance be "taken out" by the decedent or that he pay the premiums was eliminated. As revised, the sole standard for taxability (except where the proceeds are receivable by the insured's estate or his "executor") is that the insured must possess at his death "any of the incidents of ownership"; the section is as follows:

SEC. 2042. PROCEEDS OF LIFE INSURANCE.

The value of the gross estate shall include the value of all property—

(1) RECEIVABLE BY THE EXECUTOR.—To the extent of the amount receivable by the executor as insurance under policies on the life of the decedent.

(2) RECEIVABLE BY OTHER BENEFICIARIES.—To the extent of the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. For purposes of the preceding sentence, the term "incident of ownership" includes a reversionary interest (whether arising by the express terms of the policy or other instrument or by operation of law) only if the value of such reversionary interest exceeded 5 percent of the value of the policy immediately before the death of the decedent. * * *

One of the objectives in adopting the revised standard was to place life insurance policies in an analogous position to other property. The new provisions were explained by the Senate Finance Committee as follows (S. Rept. 1622, 83d Cong., 2d Sess. 124 (1954)):

The proceeds of life insurance on a decedent are subjected to tax in his estate under present law if the policy is payable to the executor, if the decedent paid the premiums on the policy (in this case includible in proportion to the amount paid), or if the decedent possessed any elements of ownership in the policy at date of death.

No other property is subject to estate tax where the decedent initially

---

A dispute also arose as to the rights of decedent's adopted children (Richard and Deborah) to participate in the trust, and a settlement was reached to allow each adopted child of decedent to receive one-tenth of the net trust assets of the 1946 trust.

purchased it and then long before his death gave away all rights to the property and to discriminate against life insurance in this regard is not justified.

The House and your committee's bill retains the present rule including life insurance proceeds in the decedent's estate if the policy is owned by him or payable to his executor, but the premium test has been removed. To place life insurance policies in an analogous position to other property, however, it is necessary to make the 5-percent reversionary interest rule, applicable to other property, also applicable to life insurance.

Thus, Congress has made taxability turn upon the passing of the insurance proceeds to the decedent's estate "or upon the extinguishment at his death of rights ('incidents of ownership') which he possessed in the policy at the time of his death." *Estate of Skifter v. Commissioner*, 56 T.C. 1190, 1197 (1971), affd. 468 F.2d 699 (2d Cir. 1972).

Respondent determined in the notice of deficiency that, within the meaning of section 2042(2), "decedent, as trustee * * * , possessed incidents of ownership" in the three entrusted insurance policies and that their proceeds are, therefore, includable in decedent's estate. Petitioner maintains that decedent did not possess any incidents of ownership in the policies in his individual capacity and that the rights and powers which he had as trustee of the 1946 trust do not require inclusion of the policies' proceeds in his gross estate. We agree with petitioner.

## 3. Fiduciary Powers Argument

In his opening brief, respondent began with the premise that "life insurance is per se testamentary."[4] From this premise, he argued that section 2042(2) requires the inclusion of life insurance proceeds in the gross estate when the decedent-insured at the time of his death possesses fiduciary powers to affect the beneficial enjoyment of the policy, its proceeds, or the time and manner of enjoyment, even though such powers were transferred to the decedent by a third party and the decedent could not have received economic benefits from the insurance. To support this position, respondent relied upon a

---

[4]In *Estate of Skifter v. Commissioner*, 56 T.C. 1190, 1196 (1971), affd. 468 F.2d 699 (2d Cir. 1972), this Court, referring to the quotation set forth in the text above from S. Rept. 1622, 83d Cong., 2d Sess. 124 (1954), stated that "Congress refused to accept in its fullest form the notion that life insurance is by its very nature testamentary in character."

line of cases in the Court of Appeals for the Fifth Circuit beginning with *Estate of Lumpkin v. Commissioner*, 474 F.2d 1092 (5th Cir. 1973), revg. 56 T.C. 815 (1971), and continuing with *Rose v. United States*, 511 F.2d 259 (5th Cir. 1975), and *Terriberry v. United States*, 517 F.2d 286 (5th Cir. 1975)— referred to by respondent as "the Lumpkin-Rose-Terriberry triology [sic]." Respondent frankly recognized that his argument was contrary to the conclusions reached in *Estate of Skifter v. Commissioner, supra; Estate of Fruehauf v. Commissioner*, 427 F.2d 80 (6th Cir. 1970), affg. 50 T.C. 915 (1968); and *Hunter v. United States*, 624 F.2d 833 (8th Cir. 1980).

In his reply brief, respondent revised his legal stance and stated that the legislative history of section 2042(2), quoted in part above, indicates that Congress intended to give life insurance policies tax treatment that approximately parallels the treatment that is given to other types of property by sections 2036, 2037, 2038, and 2041. His reply brief states:

The respondent has reconsidered his position and is in agreement with the Second Circuit in the *Estate of Skifter v. Commissioner*, 468 F.2d 699 (2nd Cir. 1972), *aff'g.* 56 T.C. 1190 (1971), that powers possessed by decedent in a fiduciary capacity do not constitute incidents of ownership for the purposes of section 2042(2) where they have devolved on the decedent after the decedent has divested himself of all interest in the policies and where the decedent cannot exercise the powers for the decedent's own personal benefit. It should be noted that if the divestiture of the powers by decedent and the subsequent conveyance of the powers back to decedent were part of a prearranged plan (not applicable in this case), the respondent would then consider the fiduciary powers as incidents of ownership causing inclusion of the insurance proceeds in the decedent's estate.[5]

---

[5]Respondent's new position, he states, is consistent with *Estate of Fruehauf v. Commissioner*, 427 F.2d 80 (6th Cir. 1970), affg. 50 T.C. 915 (1968), and *Hunter v. United States*, 624 F.2d 833 (8th Cir. 1980). Respondent also states that he continues to agree with *Rose v. United States*, 511 F.2d 259 (5th Cir. 1975), because "the decedent-trustee [in that case] procured the insurance policies himself and retained incidents of ownership until his death." As to *Terriberry v. United States*, 517 F.2d 286 (5th Cir. 1975), he states:

"Under the respondent's new position, the decedent in *Terriberry* would not possess incidents of ownership assuming that the decedent's powers could not be exercised for his own personal economic benefit and the decedent did not retain an interest in the powers."

Respondent further states in his reply brief that:

"The new position of the respondent with regard to the powers of a fiduciary over life insurance contracts does not affect the respondent's position on the issue in *Estate of Lumpkin v. Commissioner*, 474 F.2d 1092 (5th Cir. 1973), *rev'g.* 56 T.C. 815 (1971) and *Estate of Connelly v. United States*, 551 F.2d 545 (3rd Cir. 1977) concerning the powers possessed by employees under non-contributory group term life insurance to alter the time and manner

## 4. Beneficial Powers Argument

Respondent, having thus conceded that fiduciary powers which were not retained by a decedent and which could not have been exercised for his benefit will not support the inclusion of the proceeds of insurance policies in the decedent's gross estate, we turn to his other contentions. He argues that the 1946 trust agreement specifically vested in decedent powers and rights to deal with the insurance policies as his own property and for his own benefit. On this ground, he maintains that the policies are includable in decedent's gross estate.

Respondent is, of course, correct that "a fiduciary may be authorized by the terms of the instrument creating his powers to do that which in the absence of such provision would be a violation of his fiduciary duty of loyalty." *Estate of Fruehauf v. Commissioner*, 427 F.2d at 86; 2 A. Scott, Trusts sec. 170.9, at 1321 (3d ed. 1967). But, in the instant case, the powers given decedent, to which respondent points, were fiduciary powers and were not to be exercised for his own benefit. Under the position taken in respondent's reply brief, therefore, those powers do not support inclusion of the policies in decedent's estate.

Respondent relies upon paragraph 15 of the trust instrument.[6] That paragraph vests in the "Trustee" the "same right,

of enjoyment of the proceeds. The Fifth Circuit in *Estate of Lumpkin* held that the employee's powers were 'substantial powers, which constituted incidents of ownership and included the policy proceeds in the employee's gross estate.['] The Third Circuit, however, in *Estate of Connelly* on facts substantially similar to those in the *Estate of Lumpkin* held that the policy proceeds were not includible in the decedent's gross estate. The employees in the fact situation represented in the *Estate of Lumpkin* and *Estate of Connelly* obtained the group term insurance as consideration of their past and future services. Thus, the employee powers over the insurance policy did not devolve upon them after they had divested themselves of the powers. Accordingly, respondent's new position with regard to the issue of the possession of fiduciary powers does not affect the respondent's position concerning the fact pattern in *Estate of Lumpkin* and *Estate of Connelly*. Rev. Rul. 81–128, 1981–1 C.B. 469."

[6]Par. 15 of the trust instrument is as follows:

"If any policies of life insurance shall at any time be held as a part of the trust estate the Trustee shall be vested with the same right, title and interest in and to said policies and the insurance represented thereby and shall have the same rights, options, benefits, powers and privileges with respect thereto as he would have as the absolute owner thereof, including but without limitation the following: To surrender, assign, sell at public or private sale, exchange, convert or otherwise dispose of said insurance policies at such time or times, in such manner, upon such terms and conditions and for cash or credit as the Trustee in his

title and interest in and to said policies and the insurance represented thereby" and "the same rights, options, benefits, powers and privileges with respect thereto as he would have as the absolute owner thereof." The paragraph further provides that companies issuing the policies "shall recognize the Trustee" as vested with all rights and powers over the policies and that his actions thereon "shall be final and conclusive."

These powers, however, were conferred on decedent as trustee. He was to hold them as long as he served in that capacity. They were not personal to him, and he could not lawfully use them for his personal benefit. He could lawfully exercise them solely for the benefit of the beneficiaries of the trust. Even though they were broad powers of discretion, he was under a duty to exercise them in accordance with the law and with his duties and obligations as trustee of the trust. *In re Gehl's Estate*, 5 Wis. 2d 91, 92 N.W.2d 372, 376 (1958); *In re Gabel's Will*, 267 Wis. 208, 64 N.W.2d 853, 855 (1954). See *Dick & Reuteman Co. v. Doherty Realty Co.*, 16 Wis. 2d 342, 114 N.W.2d 475, 479 (1962); *In re Cosgrove's Will*, 236 Wis. 554, 295 N.W. 784, 788 (1941).

Respondent seems to argue, however, that because decedent was given power as trustee to manage the insurance policies as if he were the owner, he could use the powers for his personal benefit. We do not agree. The broad powers conferred on the trustee of the 1946 trust are not unusual in cases where a trust grantor desires flexibility in the administration of the trust.[7]

---

absolute discretion shall deem proper; to borrow under the terms of said policies any sums of money or otherwise to pledge or hypothecate said policies as collateral for any loans, to apply dividends in respect of said policies toward the reduction of premiums thereon, or to exercise dividend options in respect of said policies in such other manner as he in his absolute discretion shall deem proper. The Trustee on the maturity of any of said policies shall have the power to take such steps either by legal proceedings or otherwise as he shall deem proper to collect any and all sums of money which shall then be payable in respect thereto and to pay the expenses of such collection out of the income or principal of the trust estate. The companies issuing said insurance policies shall recognize the Trustee as vested with all right, title and interest in and to said insurance policies and the insurance represented thereby as well as with any other powers granted herein and all his acts and proceedings in respect of said policies and the proceeds thereof shall be final and conclusive upon said companies and all persons interested in the trust estate."

[7]Under the 1946 trust agreement, decedent was not only given broad powers with respect to insurance policies, but also was vested with the power to manage trust stocks and securities "as fully as though he were the absolute and individual owner" and to deal with trust real estate in the same manner "as it would be lawful for any person owning the same to deal" with it. We also note that decedent as trustee of the Silverstein trust was granted

In *Laganas v. Commissioner*, 281 F.2d 731, 733 (1st Cir. 1960), revg. in part, affg. in part, and remanding a Memorandum Opinion of this Court, for example, the court commented that powers conferred on a trustee similar to the ones in the instant case were broad "but not more so than the powers now customarily granted to testamentary and indenture trustees."[8] In *Estate of Skifter v. Commissioner*, 56 T.C. at 1192, decedent-Skifter was authorized by his deceased wife's will as trustee of her testamentary trust in his absolute discretion with respect to all trust property "generally to exercise all such rights and powers and to do all such acts as I might do with respect to such property if I were living and the absolute owner thereof." To the argument that such broad powers were tantamount to ownership, this Court responded (56 T.C. at 1197):

But those powers could be exercised only within the framework of the trust and not for his own benefit. He still had no interest in the policies and could not effect any change as trustee that would give him any rights therein.

That the powers in the instant case were not intended to be exercised for the benefit of decedent personally is shown, moreover, by a provision in the trust instrument that, upon the death or resignation of the trustee, "The successor trustee shall succeed to all the rights, powers and trusts and shall assume all the obligations of such deceased or resigning trustee." Surely it cannot be contended that the trust instrument was intended to vest the successor trustee, whoever he

the power to manage the trust estate in such fashion "as he would have the right to do if he were the individual owner."

To buttress his point that settlors, desiring flexibility in the administration of the trust, frequently provide that a trustee shall have power to do all things in relation to the trust property that he could do as outright owner of the property, petitioner points to suggested provisions in standard form books such as 4 J. Rabkin & M. Johnson, Current Legal Forms with Tax Analysis, Form 9.34, at 9–2019 (1982), which contains the following:

"The Trustee shall be vested with all rights, powers, options, and privileges in and to the insurance policies which are part of the trust estate, and the Trustee may exercise any and all of such rights, powers, options, and privileges as fully as any owner of such policies might do."

[8]The trust instrument involved in that case provided that the trustee(s) "shall have and exercise the exclusive management and control * * * in any manner that they shall deem for the best interests of the shareholders, with all the rights and powers of absolute owners thereof." *Laganas v. Commissioner*, 281 F.2d 731, 733 (1st Cir. 1960), revg. in part, affg. in part, and remanding a Memorandum Opinion of this Court.

might be, with authority to exercise the broad trust powers for his own benefit.

## 5. Retained Powers Argument

Respondent next argues that decedent should be treated as a cosettlor of the 1946 trust because, after the trust's nominal funding in 1946 by his father, decedent allegedly contributed $9,800 in 1947 which was used to pay the premiums on the life insurance policies. Respondent seems to argue that we should consider decedent's alleged contribution of cash which he as trustee used to purchase the policies as equivalent to a contribution of the policies themselves to the trust. Because decedent as trustee had certain powers over the policies, respondent maintains that the "retention of powers test" applies.

In citing this "test," respondent refers to the principle that "Congress intended section 2042 to parallel the statutory scheme governing the interests and powers that will cause other types of property to be included in a decedent's estate." *Estate of Skifter v. Commissioner*, 468 F.2d at 702. Because "a transfer of property generally with reservations of powers by the transferor as trustee may be sufficient to bring the property within the gross estate regardless of whether such powers may be exercised for his own benefit" (*Estate of Skifter v. Commissioner*, 56 T.C. at 1199), respondent argues that the $9,800 contribution to the trust requires the full amount of the proceeds of the insurance policies to be included in decedent's gross estate. See, e.g., *United States v. O'Malley*, 383 U.S. 627, 633–634 (1966); *Lober v. United States*, 346 U.S. 335, 337 (1953).

The facts simply do not fit respondent's scenario. While decedent did contribute $9,800 (of the total contributions of over $240,000), the record does not reveal when this $9,800 transfer was made. We know only that it occurred prior to 1967. Moreover, the $14,389.95 paid in connection with the Silverstein trust was transferred to the 1946 trust in December 1946. There is no evidence to show that a portion of the Silverstein trust payment was not used to fund the initial premiums on the two February 1947 policies. As for the 1953 policy, numerous contributions from Harry Bloch, Sr., had been received by the 1946 trust prior to the issuance of that

policy, and those contributions could have funded the premiums.[9]

To be sure, in this case, decedent acquired his trust powers over the policies through his own action; that is, he signed the 1946 trust instrument as trustee and caused the trust to acquire the policies. His trust powers over the insurance on his life thus did not devolve upon him through fortuitous circumstances as certain powers did upon Mr. Skifter in *Estate of Skifter v. Commissioner*, 56 T.C. at 1197. In the absence of any other probative evidence, however, decedent's bare act of procuring the policies as trustee does not permit the conclusion that decedent was a cosettlor or was ever the individual owner of the policies.

### 6. Pledge of the Policies Argument

We are left with the troublesome fact that decedent pledged the three life insurance policies to the First Wisconsin National Bank to secure his own personal loans and loans to Bloch-Daneman Co., a corporation in which he owned 50 percent of the stock. The policies remained pledged at the date of decedent's death. Respondent argues that decedent thereby, in fact, obtained personal economic benefits from the policies and that they should, therefore, be included in his gross estate.

As indicated by our previous discussion of respondent's "beneficial powers argument," we can find nothing in the 1946 trust agreement authorizing decedent to pledge the policies to secure his personal or corporate loans. When decedent used the life insurance owned by the 1946 trust as collateral for bank loans in which he had a personal interest, he acted contrary to the provisions of the trust agreement and clearly in breach of his duty as trustee of undivided loyalty to the beneficiaries. *Dick & Reuteman Co. v. Doherty Realty Co.*, 16 Wis. 2d 342, 114 N.W.2d 475 (1962); *In re Filardo*, 221 Wis. 589, 267 N.W. 312 (1936).

Indeed, prior to decedent's death, the bank's attorneys advised the bank that decedent apparently did not have authority to make the pledge, and the bank sought to have

---

[9]It might be argued that, even if a tracing were made between decedent's contributions and premium payments, such a link is irrelevant in light of Congress' elimination of the premium payment test. See *Estate of Skifter v. Commissioner*, 56 T.C. at 1197.

decedent substitute other collateral or make other arrangements. As other possible solutions, the bank suggested that its loan be made to the 1946 trust and that decedent then borrow directly from the trust, or that the three Bloch sons, who were beneficiaries of the trust, authorize a pledge of the trust's assets. At decedent's death, none of these steps had been taken. The result was that at decedent's death the policies remained wrongfully pledged to the bank to secure his personal indebtedness and that of Bloch-Daneman Co. Decedent's wrongful use of his trust powers in pledging the policies, however, did not convert those powers into "incidents of ownership" within the meaning of section 2042(2). The estate tax is an excise tax on the transmission of property at death, not a device to correct past wrongs.

In the case of a trustee's conversion of other types of entrusted property such as cash which cannot be traced, the victim of the conversion has a claim against the estate which, in computing the estate tax, will offset the unidentified funds included in the estate.[10] If the converted property could be identified, the victim could recover it in kind, and it would not be includable in the decedent's estate. In the instant case, when the successor trustees learned of the pledge, they filed a claim against the estate. The matter was resolved pursuant to an agreement whereby the bank released all except $100,000 of the proceeds. That sum was held in a special account until the estate was liquidated and found fully solvent, and it was then turned over to the trust. Although decedent may have benefited from his wrongful use of the policies during his lifetime and thus enhanced the value of his estate, we do not

---

[10]In *Estate of Fuchs v. Commissioner*, 47 T.C. 199, 206 (1966), each of two partners (John and Forrest) had obtained insurance on decedent-partner's life to fund a buy-sell agreement; the partnership contract provided that each partner was to have the incidents of ownership of the policies he had obtained, but the policies issued to John and Forrest mistakenly gave the decedent-partner some of the incidents of ownership of their policies. Holding that the policies, despite their provisions, were not includable in the decedent-partner's gross estate, the Court said:

"If decedent had acted to violate the terms of the partners' agreement by changing the beneficiary on the Fuchs or Pflasterer policies, John or Forrest would have had a valid claim against decedent's estate which would have reduced the gross estate by an equivalent amount. Sec. 2053(c)(2); sec. 20.2053–4, Estate Tax Regs. Thus, if decedent had exercised any of his so-called incidents of ownership, his estate would be liable to John or Forrest for the amount of the insurance proceeds, which liability would, in turn, reduce his gross estate."

think those benefits permit the proceeds of the policies to be included in the gross estate.

To reflect the disposition of other issues,

*Decision will be entered under Rule 155.*